## JOHN WAKEFIELD v. J. F. DYER.

### (Filed March 4, 1904.)

CROPS—Personal Property—Severance—Rule. Crops which are mature and have been severed from the soil are personal property for all purposes. Where a person rents an Indian allotment through the proper authorities, and is by these authorities placed in possession of the same, and while so in possession by his annual labor and cultivation plants, cares for, harvests, and severs from the soil a crop, he is the owner of said crop as against another claiming the same by virtue of what he maintains to be a prior valid lease to the same land, for the same period, issued to him by the same authorities.

(Syllabus by the Court.)

*Error from the District Court of Canadian County; before C. F. Irwin, Trial Judge.*

*Marsh & Wallace,* for plaintiff in error.

*J. J. Carney,* for defendant in error.

#### STATEMENT OF FACTS.

This is an action of replevin in which the plaintiff seeks to recover a crop of wheat and oats alleged to be of the value of $1,620.00. The land on which the wheat and oats in controversy in this case grew was an Indian allotment, and the property of an Indian named Bear Robe. John C. Dyer leased this land in May, 1897, from Bear Robe through the Indian agent at Darlington, Oklahoma, for a period of three years, beginning July 1, 1897, and ending June 30, 1900. There were no buildings on the land and no one lived on it, but Dyer cultivated it himself until 1899, when he moved to El Reno. In September, 1899, the plain-

tiff, Wakefield, wanted to get land to cultivate, went to the Indian agent at Darlington and asked about Indian lands. He was informed that this allotment, belonging to Bear Robe was vacant and for rent. Wakefield leased it and afterwards Wakefield's lease was approved by the secretary of the interior, and the Indian agent directed the farmer, Jesse Wither, to place Mr. Wakefield in possession of the same, and he did so by going on the land and removing therefrom one J. F. Dyer, the father of the said John C. Dyer, and placing the plaintiff, Mr. Wakefield, in possession. The Dyers had broken out about 100 acres of the land, and when J. F. Dyer was removed from the premises by the Indian farmer, Jesse Wither, he was planting fall wheat, and had about 20 acres already in. Mr. Wakefield, being placed in possession, put out about 100 acres of fall wheat during the month of October, 1899, and he remained in possession of the land continually, and in June, 1900, he harvested the crop of wheat and oats, which he had sown on the place. About a month after the wheat and oats had been harvested, and while it was yet in the shock on the land, and at a time when the lease made by John C. Dyer had fully expired, J. E. Dyer, assisted by a number of armed men with teams, went upon the land and removed therefrom all of the wheat in the shock, carried it away, placed it on his own land, and appropriated it to his own use. Wakefield then brought this action of replevin to recover the said wheat. J. F. Dyer, the defendant in the case, gave a redelivery bond and retained the wheat. The case was tried in April, 1901. When the evidence was all in, the court directed a verdict for the defendant, which was accordingly returned by the jury, and

judgment was rendered against the plaintiff Wakefield for costs. From this judgment he appealed and brings the case to this court for review.

·Opinion of the court by

GILLETTE, J.: The lease of John C. Dyer was cancelled by order of the Indian agent, at the time the Wakefield lease was executed, but the record discloses that both plaintiff and defendant agreed, at the trial, that the power to cancel the lease was not vested in the Indian agent, and that this order of cancellation was a nullity.

It is contended by the plaintiff, Wakefield, that J. F. Dyer, whom the farmer, Jesse Wither, removed from the place when he put the plaintiff, Wakefield, in possession, was a mere trespasser thereon, and had no legal rights there, either under his son, John C. Dyer, or any one else. Some proof tending to support this contention was offered by the plaintiff and rejected by the court, and of this ruling, among others, the plaintiff, Wakefield, complains and predicates error. We pass these matters by, however, and come to the pivotal point in the case: Was the plaintiff, Mr. Wakefield, or the defendant, Mr. Dyer, the owner of the wheat involved in this action. Both of these parties claimed the wheat under and by virtue of the leases which the Indian agent issued to them; J. F. Dyer claiming of course under the lease issued to his son, John C. Dyer.

That the crop was grown on the Bear Robe land; that it was mature; that it had been severed from the soil; that it was clearly personal property; that all but 20 acres of it had been planted by Mr. Wakefield; that all of it had been cared for and harvested by him; that when Dyer, with his

armed force entered upon the land and carried away the crop, it was then cut and in the shock, and had been for nearly a month, are questions about which there is no dispute. Under these circumstances it seems clear to us, that the wheat was the property of the plaintiff, Wakefield, and that the trial court erred in directing a verdict for the defendant, Dyer. We think it can be fairly said, from the record as it comes to this court, that whatever their legal rights may have been, both parties, Wakefield and Dyer, honestly claimed and believed that they were each entitled to the wheat. But even though the plaintiff, Wakefield, is regarded as not having derived any rights whatever from his lease, which he secured from the Indian agent, yet we think, under the facts in the case, that the wheat in question was the property of Mr. Wakefield, and whatever Mr. Dyer's legal rights in the premises may have been it was not to take from Mr. Wakefield by armed force or otherwise the wheat itself which Mr. Wakefield had planted, cared for and in harvesting had severed from the land while he was in adverse possession thereof.

Cases closely resembling the one at bar have been before this court, involving the rights of contestors and contestees in the crops raised on the land, while the contest was yet pending and undetermined. These cases have settled the law in this Territory, both as to growing and immature crops, as well as those mature and which have been severed from the soil, involved in the contest. (*Phillips v. Keysaw,* 7 Okla. 674, 56 Pac. 695; *Kirtley v. Dykes,* 10 Okla. 16, 62 Pac. 808.)

In the case of *Phillips v. Keysaw, supra,* Keysaw entered

a piece of government land on the 16th of September, 1893, and claimed the same as a homesteader. October 13, 1893, the plaintiff in error, Phillips, contested his entry for prior settlement. The local land office decided in favor of Keysaw. On appeal the commissioner of the general land office affirmed the decision, but on appeal further the secretary of the interior reversed the decision of the commissioner and the local land office, and awarded the land to Phillips. Pending the contest Phillips had possession of the north 90 acres of the land, and Keysaw had possession of the south 70 acres thereof. The land was entered, as before stated, in September, 1893. The contest was pending almost four years; the final decision in favor of Phillips, not being handed down by the secretary of the interior until March, 1898. Keysaw planted a crop of wheat, or had it planted, in the fall of 1897, which of course was growing and immature when the contest was finally decided against him in the following March. He was not however, evicted, but remained in possession of the 70 acres until the crop of wheat had matured and had been severed from the realty by him. Phillips claimed this wheat because in March, 1898, while the wheat was yet growing and immature the contest was decided in his favor, and he claimed that he thereby became and was the owner of the land and the growing and immature crops, and that Keysaw was, from this time on, if not from the beginning of the contest in 1893, a mere trespasser on the land. Phillips brought an action to enjoin Keysaw from interfering with his exclusive possession of the 70 acres of land and the 60 acres of wheat grown thereon. This action was brought on June 16, 1898. On June 20,

1898, Keysaw began cutting the wheat, but no application for a temporary injunction was presented or order of injunction issued until June 27, 1898, at which time the said wheat had all been cut and was in the shock on the land. In a well considered opinion by Justice Tarsney, it was said:

"The simple question involved in this case is, who was the owner of the wheat in question when the temporary order of injunction was granted? The fact that the defendant Keysaw was, at the time of the issuing of the injunction, liable to Phillips, or might thereafter become liable for the mesne profits of the land withheld by him from the possession of Phillips during the pendency of the contest proceedings, or for any other debt, would not give jurisdiction to the court or judge by injunction to prevent him from selling or disposing of the same, unless Phillips was the owner of said wheat, or had some legal property interest therein.

"Growing crops produced by manual labor and cultivation are, for some purposes, a part of the real estate to which they are attached, and until there has been a severance of them from the land, actual or constructive, they follow the title thereto. For other purposes, they are regarded as personalty, and do not pass with the land, but go to the planter.

"Crops, after maturity, and severance from the soil, are, for all purposes, personal property. Where there has been a recovery of the possession of the land held adversely, the successful plaintiff is entitled to the growing crop, as against the evicted defendant, who planted them; but, until said adverse possession has been determined by ouster, the party so adversely holding is the owner and entitled to the crops produced by his annual labor and cultivation, which were harvested before such ouster."

From March, 1898, the time the final decision of the secretary of the interior was received, Keysaw was a naked

trespasser on the land. If he had been evicted at any time before the wheat was cut, it would have gone to Phillips. He was not evicted, however, but remained in possession and harvested the crop. The crop under such circumstances, is held in this opinion to have been the property of Keysaw.

In the case at bar, Wakefield continued in possession of the land from the time the Indian farmer, Jesse Withers, put him in possession of the same, and during that time he planted, cared for and harvested the crop, and was therefore clearly the owner of it. Justice Tarsney, in the opinion in the Phillips-Keysaw case, above cited, also says, citing ample authority:

"Numerous well considered cases, and, as we think, perhaps the weight of authorities, hold that where a crop is sown by a trespasser, and is by him cultivated and severed, it becomes the personal property of the trespasser, even as against the owner of the land.*  *  * But it is unnecessary nor would it be proper, for us to pass upon this proposition, as it is not involved in this case. We only cite these authorities to show that respectable courts hold that not only persons holding adversely, but even trespassers, who plant and cultivate annual crops, and sever them from the soil, before their possession is terminated, are the owners of such crops."

We think that Mr. Wakefield can be fairly said in this case to have been holding adversely, and it is not necessary, therefore, for us to declare the law to be in accord with the above quotation from Justice Tarsney's opinion, but our further investigation in this case leads us to endorse again the observations made by him in this connection.

If the plaintiff, Wakefield, acquired no rights under his lease from the Indian agent, it may be that the defendant Dyer might properly have maintained an action against him

for the value of the use and occupation of the land under sec. 2638, Statutes of 1893, and if the grounds for an attachment existed he might have attached Wakefield's wheat for the debt due him; but we are clear that Dyer did not own the wheat, and his entering on the land with an armed force and carrying it away was without a semblance of legal authority and entirely unwarranted.

J. F. Dyer was probably a trespasser on the land *ab initio*, as J. C. Dyer had no authority under his lease to sublet the land to him or maintain him in possession or control of the same, to the extent of acquiring title to growing crops, and as the lease of J. C. Dyer had wholly expired at the time the wheat and oats were taken from the land and from the possession of Wakefield, it is hard to find any legal justification for the act of defendant in forcibly removing the same.

It was shown in evidence that in November, 1899, and shortly after Wakefield had finished sowing wheat on the land, J. C. Dyer instituted an action of forcible entry and detainer against Wakefield in the probate court of Canadian county and secured a judgment of ouster. The defendant introduced this judgment in evidence, but the execution or writ of ouster was not introduced, and Mr. Wakefield stoutly denied while on the stand that he had ever been ousted after taking possession of the land. If there was any effort to carry this judgment into effect, it was a very meager one, and Wakefield seems to have remained in possession continuously from the time the Indian farmer, Jesse Withers, placed him in possession until the crop was harvested and severed from the soil. If such judgment was of any avail whatever in this

case, it did not affect or tend to vest in J. F. Dyer any title to the crop grown by Wakefield on the premises, much less to authorize him to make a forcible entry of the premises, after J. C. Dyer's lease had fully expired, and forcibly remove therefrom the severed crops.

We think, as the record comes to this court, that the proceedings had before the probate court could not and did not affect substantially the legal standing or rights of either party.

Entertaining the views we do, we think the trial court erred in directing a verdict for the defendant, and for this error the judgment of the court below is reversed, and the case is remanded for a new trial.

Irwin, J., who presided in the court below, not sitting; Burford, C. J., absent; all the other Justices concurring.